**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JULIO G. PIMENTEL,** | ) | |
| | ) | **No. 11 CV 8240** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | **January 8, 2013** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION and ORDER**

Julio Pimentel filed applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"), 42 U.S.C. §§ 416(i), 423, 1381a, 1382c, claiming that he is disabled by a combination of degenerative disc disease, diabetes, hypertension, obesity, and depression. After the Social Security Administration rejected his applications, Pimentel brought this suit challenging the decision to deny him benefits. Currently before the court are the parties' cross motions for summary judgment. For the following reasons, the government's motion is denied, Pimentel's motion is granted, and the case is remanded for further proceedings consistent with this opinion:

**Procedural History**

Pimentel filed his applications for DIB and SSI in January 2007, alleging a disability onset date of December 16, 2005. (Administrative Record ("A.R.") 169-70.) His claim was denied initially, upon reconsideration, and in a decision issued by an administrative law judge on March 3, 2009. (Id. at 167-70, 174-84.) After Pimentel sought review from the Appeals

Council, it vacated the ALJ's decision and remanded the matter to a new ALJ to give further

consideration to a non-treating source opinion and to further evaluate Pimentel's claimed

mental impairment. (Id. at 188-89.) On August 19, 2010, the assigned ALJ held a hearing

at which Pimentel, a medical expert, and a vocational expert all testified. (Id. at 47-106.)

When the ALJ denied Pimentel's applications for benefits in January 2011, he again sought

review before the Appeals Council. (Id. at 7, 20.) This time the Appeals Council denied his

request, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *see*

*Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Pimentel then filed the current suit

seeking judicial review of the ALJ's decision. See 42 U.S.C. § 405(g). The parties have

consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Pimentel suffers from obesity and several correlated conditions: type two diabetes,

hypertension, back pain, neuropathy, and depression. In the current suit, he also asserts that

he is disabled by mental impairments that cause him to have mood swings and outbursts of

anger, and to struggle with short-term memory and concentration. At the August 2010

hearing, Pimentel presented both documentary and testimonial evidence in support of his

claims.

### A.    Medical Evidence

In September 2006 Dr. Raj Mikkilineni examined Pimentel and issued a report

assessing his type two diabetes and hypertension. (A.R. 432.) He noted that Pimentel—who

is six feet tall and weighed 273 pounds when Dr. Mikkilineni examined him—was diagnosed

2

with hypertension in 2000 and diabetes in 2003, and that his symptoms included occasional chest pain with exertion, difficulty controlling his blood sugar levels, and trouble holding urine. (Id. at 432-33.) Pimentel also complained of back pain and of joint pain in his right wrist, left arm, and right ankle, and he reported experiencing anxiety, depression, and memory problems. (Id. at 432-34.)

In March 2007 Pimentel underwent an examination with consulting physician Dr. Sreekanth Chintamaneni. (Id. at 460.) Pimentel weighed 294 pounds at the time of the examination. (Id. at 461.) Dr. Chintamaneni reported that Pimentel is limited in his ability to bend 70 degrees or to squat, and that he had tenderness over the lumbar spine. (Id.) He noted that there is evidence that Pimentel has neuropathy and hypertension, and recommended that he undergo imaging studies to evaluate his low back pain. (Id. at 462.) Pimentel underwent an MRI which revealed moderate degenerative disc disease. (Id. at 464.) Later that same month Dr. Yvonne Post, a medical consultant, completed a physical residual functional capacity ("RFC") assessment based on her review of Pimentel's medical records. (Id. at 468-75.) She opined that Pimentel can sit, stand, or walk for six hours in an eight-hour work day and that he would be limited to only occasionally climbing or stooping. (Id. at 469-70.) She noted that Pimentel's complaints were "partially supported" by the evidence of record, but otherwise she did not explain her findings. (Id. at 473.)

In July 2007 Pimentel was seen by consulting physician Dr. Abul Rahman, who noted that Pimentel was complaining of back pain, tingling and numbness in his legs and feet, and intermittent chest pain. (Id. at 476.) Dr. Rahman described Pimentel as "alert, awake, and

in no acute distress," and without any recent weight changes. (Id. at 477.) Dr. Rahman found that Pimentel was "able to bend all the way over and get back up without difficulty" and to squat without difficulty, but noted that he had tenderness around the lumbar spine. (Id.) Dr. Rahman described Pimentel's symptoms as revealing peripheral neuropathy and chronic musculoskeletal strain manifesting in low back pain. (Id. at 478.)

In December 2008 the state disability agency referred Pimentel for a mental health assessment with Licensed Clinical Psychologist Victor Hirsch, Ph.D. (Id. at 495.) In reporting Pimentel's background information, Dr. Hirsch noted that Pimentel's ex-wife had accused him of trying to murder her and he was under investigation for three years before the case was dropped. (Id.) Dr. Hirsch noted that Pimentel had been fired from his job working as an estate tax attorney for the IRS on December 17, 2005, after he was accused of cheating on his income taxes. (Id.) Pimentel eventually persuaded the IRS to change his status from being fired to having resigned. (Id.) Dr. Hirsch noted that Pimentel had been depressed since losing his job and that he has a history of reported bipolar disorder (a characterization Pimentel rejected). (Id. at 496.) A friend who attended the examination with Pimentel reported that he has almost daily "melt downs" in which he will scream and yell angrily for five minutes and then act like nothing happened. (Id.) The friend reported that she feared Pimentel because "he wants to do evil things to others like hurting others." (Id.) She said that Pimentel is very controlling and is "very angered by all the idiots around him." (Id.) Dr. Hirsch noted that Pimentel showed hatred toward his father, who he described as "very abusive." (Id.)

4

In his notes describing his testing and observations, Dr. Hirsh described Pimentel as being cooperative and polite, but "very verbose." (Id. at 497.) He observed that Pimentel was calling "everyone idiots," noting that he "may have some difficulty with people in the authority position." (Id. at 497, 501.) Dr. Hirsch described Pimentel's coping skills as "deficient," and noted that Pimentel reported having concentration and memory problems. (Id. at 497-98.) In the diagnostic impressions section of his report, Dr. Hirsh wrote "Rule out Bipolar Disorder" and described him as having moderate major depression, recurrent, with anger outbursts. (Id. at 501.) In the RFC assessment accompanying his report, Dr. Hirsch characterized Pimentel as having moderate limitations in the ability to make judgments on simple work-related decisions and in carrying out complex instructions, noting that he has "severe emotional problems," including "mood swings." (Id. at 504.) He assessed Pimentel as being markedly limited in his ability to interact appropriately with the public, supervisors, and co-workers and to "respond appropriately to usual work situations and to changes in a routine work setting." (Id. at 505.)

## B. Pimentel's Hearing Testimony

At his hearing before the ALJ, Pimentel described his back pain and diabetes-related symptoms. He said that during the night he has "very painful" cramps in his calves and stabbing pain and tingling in his feet. (A.R. 67-69, 87.) He also experiences low back pain that builds over the course of the day, which he treats with Bengay or by sitting in a hot tub or lying in the fetal position. (Id. at 69.) Because he has ankle pain and difficulty breathing, he said that he can only walk for two blocks without stopping for a rest, and because he has

a long-lasting injury in his right wrist, he "can't lift much." (Id. at 78-79, 81.) Pimentel quantified his leg cramps as an eight out of ten on the pain scale, and his ankles as a six. (Id. at 81.) He also described his depression, saying that he feels "very bad" and "like there's no hope." (Id. at 84.) When the ALJ asked about any side effects to his medications, Pimentel said that one of his medicines makes him feel nauseous and another makes his heart beat fast. (Id. at 85-86.)

In describing his daily activities, Pimentel testified that he lives with his parents and that he gets out of bed each day at eight o'clock, after his father—with whom he does not get along—leaves for work. (Id. at 70-71.) During the day he watches tv but he does not read often because, as he put it, "I have the books, but I know, I know what they say already." (Id. at 72.) He is able to drive, grocery shop, bathe himself, and cook. (Id. at 73, 77, 81.) He testified that he sometimes takes an afternoon nap, "not because I want to, but because I feel so tired." (Id. at 85.) Pimentel has one friend he speaks with on the phone or meets once a month for dinner. (Id. at 73.) Pimentel said that he has a "nice relationship" with his college-age children, who live with their mother. (Id. at 76.) He also has a girlfriend, with whom he stays on the weekends so he can avoid seeing his father. (Id. at 74.) He explained that he has been angry with his father since he beat him in the face when Pimentel was in fifth grade, leaving him to go to school "with belt welts on my face." (Id. at 75.) He does not speak to one of his sisters who, according to Pimentel's testimony, falsely accused him of throwing her down the stairs when she was pregnant, leading to his father giving him "70 lashes with a belt." (Id. at 77.)

Pimentel also described his past work as an attorney for the IRS, which he said involved working as a "gatekeeper" to ensure that people properly reported their estate taxes. (Id. at 57-58.) Pimentel performed this job from 1987 until December 2005, when he was fired. (Id. at 59, 61.) He said that he had one friend at work but otherwise did not interact socially with his co-workers. (Id. at 93.) According to Pimentel, he was fired in retaliation for twice emailing the Commissioner of the IRS to complain about his manager smoking in the office. (Id. at 61.) He testified that the IRS accused him of falsely claiming a childcare credit on his income taxes as an excuse to fire him, but that he demonstrated in appeals before the unemployment board that he had not cheated on his taxes. (Id. at 62-63.) According to Pimentel, his manager got rid of him as "a political move," because Pimentel "was the only Hispanic guy, everybody else was white and Jewish." (Id. at 63.) He testified that he has not been able to find another job because Caucasian people do not want to hire Hispanic people, and that he was called for interviews only after he changed the name on his resume from Julio to Steve. (Id. at 64.)

## C.    **Medical Expert's Testimony**

Medical expert ("ME") Dr. Allen Heinemann testified at the hearing based on his review of Pimentel's medical record and observation of Pimentel's testimony. (A.R. 87.) Before he began, the ALJ asked Pimentel's counsel for permission to allow Dr. Heinemann to ask Pimentel questions directly, and the attorney did not object. (Id.) Dr. Heinemann asked Pimentel if he had attended any professional counseling since his divorce in the late eighties, and Pimentel said that he has not. (Id. at 88-89.) When Dr. Heinemann asked

7

whether he believed his depression medication was helpful, he said that he had been taking it for about six months, but that he does not "really know" whether it was working, because his "problem is that I have to see my father every day." (Id. at 89.) Dr. Heinemann also asked how Pimentel gets along with others, in response to which he related a story about someone in a store "saying something to me" when he dropped some items, and him thinking to himself, "I'm going to drop you next." (Id. at 91.)

After questioning Pimentel, Dr. Heinemann testified that he does not believe that Dr. Hirsch's mental RFC assessment is supported by the record. (Id. at 94.) Dr. Heinemann said he agrees that major depressive disorder is a reasonable diagnosis given Pimentel's symptoms, but that there is "no other medical evidence of record that establishes bipolar disorder." (Id. at 94-95.) He testified that he believes that Pimentel's depression is severe, but not of a level that meets or equals a listing. (Id. at 96.) When the ALJ asked for Dr. Heinemann's assessment of Pimentel's limitations related to his depression, he described the restrictions in activities of daily living as mild, and the restrictions in his social functioning and concentration as moderate. (Id.) Dr. Heinemann also described Pimentel as having judgment that is "not the most appropriate" and of being moderately limited with respect to remembering and carrying out detailed instructions, maintaining concentration, carrying out activities within a schedule, responding to criticism, getting along with co-workers, and completing a normal work day and work week. (Id. at 97-98.)

D.    **Vocational Expert's Testimony**

8

Vocational expert ("VE") Thomas Gusloff answered the ALJ's questions regarding available jobs that would be available to hypothetical individuals with certain sets of limitations. Gusloff characterized Pimentel's past work as an attorney as skilled and falling somewhere between light and sedentary. (Id. at 100-01.) The ALJ asked Gusloff to consider someone with Pimentel's vocational profile but limited to unskilled work of a routine nature, with limitations in lifting taking into account the impact of obesity, and with moderate limitations in remembering, concentration, carrying out instructions, and getting along with others. (Id. at 101-02.) Gusloff testified that such an individual could work as a machine feeder, kitchen helper, or hand packager—all jobs that exist in substantial numbers in the Chicago area. (Id. at 102.) The ALJ next asked him to consider a similar individual with marked limitations in interacting with the public, supervisors, and co-workers and in responding to changes in a routine work situation. (Id. at 103-04.) Gusloff responded that a marked limitation in the ability to "deal with people" would eliminate all jobs. (Id. at 104.)

## E.    The ALJ's Decision

After considering the proffered evidence, the ALJ concluded that Pimentel is not disabled. In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520, which requires him to consider:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform [his] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309,

313 (7th Cir. 1995)).  If at step three of this framework the ALJ finds that the claimant has

a severe impairment which does not meet the listings, he must "assess and make a finding

about [the claimant's RFC] based on all the relevant medical and other evidence."  20 C.F.R.

§ 404.1520(e).  The ALJ then uses the RFC to determine at steps four and five whether the

claimant can return to his past work or to different available work.  *Id.* § 404.1520(f), (g).

It is the claimant's burden to prove that he has a severe impairment that prevents him from

performing past relevant work.  *Clifford*, 227 F.3d at 868.

Here, the ALJ determined at steps one and two of the analysis that Pimentel has been

unemployed since December 16, 2005, and that his degenerative disc disease, diabetes,

hypertension, obesity, and depression all constitute severe impairments.  (A.R. 14.)  At step

three the ALJ determined that none of Pimentel's impairments or combination of

impairments meet or medically equal any of the listings.  (Id. at 15.)  In discussing that

finding, the ALJ specifically noted that Pimentel does not meet listing 12.04, which covers

affective disorders, or 12.06, which covers anxiety-related disorders.  (Id.)  The ALJ noted

Dr. Heinemann's testimony that no such listing is met and that the medical record does not

support Dr. Hirsch's assessment of Pimentel as having marked limitations in the paragraph

B criteria.  (Id.)  The ALJ found that marked limitations in the paragraph B criteria "are also

inconsistent with and not supported by the claimant's presentation during the hearing or

Dr. Hirsch's own clinical observations/findings."  (Id. at 15-16.)  After listing those findings,

the ALJ concluded that "the claimant's mental impairment does not cause at least two

'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation."
(Id. at 16.)

Proceeding to the next step of the analysis, the ALJ determined that Pimentel has the
RFC to perform light work with a number of limitations, including a limitation on performing
operations of foot and leg controls and a limitation to unskilled, routine tasks. (Id. at 17.)
He also limited Pimentel to no more than occasional interaction with supervisors, coworkers,
or peers. (Id.) In explaining his conclusion, the ALJ noted that the limitations are meant to
accommodate Pimentel's neuropathy and his moderate limitations in carrying out
instructions, maintaining attention, getting along with others, performing activities within a
schedule, maintaining regular attendance, and performing at a consistent pace. (Id.) He also
explained that he did not find Pimentel's description of his ankle and leg pain to be fully
credible because there is no medical evidence of a medically determinable impairment that
could produce the reported levels of pain. (Id. at 18.) The ALJ also said that Pimentel "is
not fully credible in asserting that he is tired every day causing him to just fall asleep
unpredictably," but that he otherwise found him "generally credible." (Id.) He also
reiterated that he rejected Dr. Hirsh's RFC assessment in favor of Dr. Heinemann's,
explaining that he found the latter "consistent with the weight of the total record" and
"supported by the medical evidence." (Id.)

Having concluded that Pimentel retains an RFC for light work with the stated
limitations, the ALJ determined that he is capable of working as a bench assembler, plated
products preparer, and touch-up screener, and that those jobs exist in significant numbers in

the regional economy. (Id. at 19.) Accordingly, the ALJ concluded that Pimentel is not under a disability as defined by the Social Security Act, and denied his applications for SSI and DIB. (Id. at 20.)

## Analysis

Pimentel's summary judgment motion presents a multi-front campaign against the ALJ's decision, challenging everything from his evaluation of Pimentel's mental impairments, to the consideration the ALJ gave to his obesity, to the credibility assessment, to his weighing of the examining physician and ME's opinions regarding his mental RFC, to his characterization of Pimentel's testimony. In the government's cross-motion for summary judgment, the Commissioner defends the ALJ's decision as being supported by the record and sufficiently thorough to satisfy the obligation to create a logical bridge between the evidence and his conclusions. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). This court reviews the ALJ's decision to ensure that it is supported by substantial evidence and unmarred by any error of law. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). In reviewing the evidence before the ALJ, this court must consider "both the evidence that supports, as well as the evidence that detracts from" the decision, and will affirm "so long as the evidence supports it and the ALJ explains [his] analysis of that evidence with enough detail and clarity to permit meaningful appellate review." *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted).

**A.    The ALJ's Assessment of Pimentel's Mental Impairments**

Pimentel's first argument—one that this court ultimately agrees requires a remand—rests on his assertion that the ALJ insufficiently assessed the limitations imposed by his depression and tendency toward angry outbursts.  Specifically, he argues that the ALJ shirked his obligation to assess his mental RFC using the "special technique" set out in listings paragraph B.  He also argues that the ALJ erred in adopting the opinion of Dr. Heinemann—the ME—over that of Dr. Hirsch—the examining psychologist—to support his conclusion that Pimentel has no marked limitations in any of the paragraph B criteria. Pimentel also contends that the ALJ violated agency regulations by allowing the ME to question Pimentel during the hearing and to base his conclusions in part on Pimentel's answers to his questions.

With respect to Pimentel's argument that the ALJ neglected to fully engage with the special technique used for mental impairments, this court agrees that the extent of the ALJ's analysis here is insufficiently clear.  The special technique requires the ALJ to engage with the evidence of a claimant's "symptoms, signs, and laboratory findings" at steps two and three of the five-step sequential evaluation to determine whether a medically determinable mental impairment exists.  20 C.F.R. § 404.1520a; SSR 96-8p, 1996 WL 374184, at *4.  If the claimant is found to have a medically determinable mental impairment, then the ALJ must rate the degree of the resulting limitations under what are known as the B criteria.  *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).  Those criteria include activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation.  *Id.*;

*see also* 20 C.F.R. § 404.1520a(c)(3). The regulations state that if an ALJ rates the claimant's degree of limitation "in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area," generally the mental impairment will not be considered severe. 20 C.F.R. § 404.1520a(d)(1). "Otherwise, the impairment is considered severe, and the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder." *Craft*, 539 F.3d at 675. If it is not, the ALJ will go on to assess the RFC. *Id.* The Seventh Circuit has made clear that in engaging the special technique, the ALJ is required to provide a specific finding as to the extent of the limitation in each of the four areas, supported by a discussion of "significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the mental impairment's severity." *Id.* Although evidence supporting the special technique and RFC assessment may overlap, "the RFC analysis is not a substitute for the special technique." *Id.*; *see also* SSR 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment[s] at steps 2 and 3.").

Here, the ALJ stated at step three that Pimentel's mental impairment does not satisfy the B criteria because he concluded that he does not have at least two marked limitations or one marked limitation and repeated episodes of decompensation. (A.R. 16.) Whether the ALJ adequately explained that conclusion is something of a close call, but one this court ultimately resolves in Pimentel's favor, because as he points out, while the ALJ listed some findings and signs in the paragraphs leading up to his conclusion regarding the B criteria, he

did not engage in his own analysis to explain what evidence supported his conclusion that Pimentel has no relevant marked limitations. In particular, the ALJ did not discharge his duty to make a specific finding as to Pimentel's degree of limitation in each of the functional areas. *See* 20 C.F.R. § 404.1520a(c). The closest he came to fulfilling that obligation was noting that Dr. Heinemann testified that Pimentel has only a mild restriction in activities of daily living and moderate difficulties in social functioning and concentration, persistence, or pace. (A.R. 16.) But at step three, the ALJ never said that he agreed with Dr. Heinemann's specific findings regarding his limitations—he simply recounted Dr. Heinemann's testimony in that regard. (Id.) The only conclusion that expresses the ALJ's own independent conclusion is his statement that Pimentel has less than two marked restrictions, but that does not answer the question of the particular degree of limitation the ALJ himself assigned to each of the functional areas.

The ALJ's statement at step four that he was adopting the opinion of Dr. Heinemann over the opinion of Dr. Hirsch—who concluded that Pimentel has marked limitations in dealing with routine work changes or interacting with others—does not resuscitate his step-three analysis. First, the regulations make clear that the RFC assessment and special technique are not interchangeable analyses. *See* SSR 96-8p, 1996 WL 374184, at *4. Accordingly, the ALJ's statement that he adopted Dr. Heinemann's assessment over Dr. Hirsh's with respect to crafting the RFC does not compensate for his failure to explain at step three whether and why he agreed with Dr. Heinemann's testimony with respect to each of the paragraph B criteria. *See Craft*, 539 F.3d at 675 (noting that "the RFC analysis

15

is not a substitute for the special technique, even though some of the evidence considered may overlap"); *see also Richards v. Astrue*, 370 Fed. Appx. 727, 730 (7th Cir. 2010) (faulting ALJ for not applying special technique "to the letter").

But even if this court were to apply the ALJ's step-four decision to adopt Dr. Heinemann's opinion to the step-three analysis, that decision rubs up against the treating physician rule. As numerous cases explain, an ALJ is not allowed to reject the opinion of an examining physician based only on the testimony of an ME. *See, e.g., Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *Delgado v. Astrue*, No. 10 CV 3963, 2011 WL 2489741, at *15 (N.D. Ill. June 21, 2011); *Jablonski v. Astrue*, No. 09 CV 3398, 2010 WL 4625451, at *5 (N.D. Ill. Nov. 5, 2010). In other words, the ALJ must point to substantial evidence to justify rejecting an examining physician's opinion, and "a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470. Here, the sum total of the ALJ's explanation for adopting the ME's opinion over the examining physician is this sentence: "[f]or reasons noted by the medical expert, I reject the assessment [of Dr. Hirsh] and agree with and adopt the assessment of the medical expert which is consistent with the weight of the total record and is supported by the medical evidence of record." (A.R. 18.) The ALJ does not clarify which of Dr. Heinemann's reasons for disagreeing with Dr. Hirsch persuaded him or why, or explain what record evidence is consistent with Dr. Heinemann's assessment but inconsistent with Dr. Hirsch's. Thus even if this court were willing to transpose the ALJ's step-four decision to adopt Dr. Heinemann's opinion to the special technique at step three, the ALJ's failure to explain his decision in

16

anything but the most conclusory terms leaves the court unable to ascertain whether it is supported by the weight of substantial evidence. *See Gudgel*, 345 F.3d at 470.

In fairness to the ALJ, and to flesh out the court's earlier statement that this issue presents a close call, the ALJ did set forth a list of evidence after concluding that Pimentel's mental impairments do not meet or equal a listing and before rendering his conclusion that he has fewer than two marked limitation with respect to the paragraph B criteria. (A.R. 15-16.) He provided a listing of Dr. Hirsch's findings with respect to Pimentel's IQ and other test results. (Id. at 16.) He even stated that Dr. Hirsh's conclusions regarding marked limitations are inconsistent with Pimentel's hearing presentation. (Id. at 15.) But he did not explain what about Pimentel's presentation was inconsistent with Dr. Hirsch's findings, nor did he address Dr. Hirsh's description of Pimentel's tendency to lash out at others, his feeling that others are out to get him, and other indicators that his social functioning and concentration might be limited. A list of evidence punctuated with a conclusion does not discharge an ALJ's duty to form a logical bridge between the evidence and his conclusion that Pimentel has no marked limitations. *See Smith v. Astrue*, No. 09 CV 6210, 2011 WL 722539, at *12 (N.D. Ill. Feb. 22, 2011) (noting that "cataloguing" the evidence "is no substitute for analysis or explanation"). And given the shortcoming in the ALJ's weighing of the physician's opinions in the RFC assessment, coupled with the evidence that Pimentel has thoughts of harming others, has difficulty dealing with authority, is prone to angry outbursts, and exhibits questionable judgment, the ALJ's failure to link up the evidence with the specific B criteria cannot be dismissed as harmless. *See Craft*, 539 F.3d at 675. That is

especially true here because the VE testified that an individual with marked limitations in routine work changes and interacting appropriately with others—limitations Dr. Hirsch attributes to Pimentel—would be unable to work in any job. (A.R. 103-04, 505.)

Less persuasive is Pimentel's assertion that the ALJ's decision should be reversed because, according to him, the ALJ violated the instructions set forth in the Hearing Appeal and Litigation Law Manual ("HALLEX") when he allowed Dr. Heinemann to question Pimentel during the hearing. He points to an excerpt of the HALLEX which reads: "[t]he ALJ will not ask or allow the ME to conduct any type of physical or mental status examination of the claimant during the hearing." HALLEX I-2-6-70, *Testimony of a Medical Expert*, 1993 WL 751901. Pimentel argues that when the ALJ permitted the ME to ask Pimentel questions about his symptoms, the result was a prohibited mental status examination. But this court need not decide whether the questioning qualifies as a mental status examination, because the ALJ specifically asked Pimentel's attorney whether he would object to the ME questioning Pimentel, and the attorney lodged no objection. (A.R. 87.) Given his failure to object at the time of the hearing, Pimentel has waived any argument that the questioning was improper. *See Allen v. Astrue*, No. 10 CV 0994, 2011 WL 3325841, at *13 (N.D. Ill. Aug. 1, 2011). Accordingly, the ALJ need not address this issue on remand, and, with respect to the mental impairment assessment, may focus on providing his own analysis of the level of impairment Pimentel exhibits with respect to the paragraph B criteria and on giving a more detailed and supported explanation if he adheres to his decision to reject the examining physician's opinion.

18

**B.      The ALJ's Evaluation of Pimentel's Physical Impairments**

Pimentel also persuasively argues that the ALJ committed several reversible errors in evaluating his physical impairments for purposes of developing the RFC.  Front and center among those arguments is his contention that the ALJ gave insufficient reasons for discounting his testimony regarding the level of pain he experiences in his lower extremities. Specifically, the ALJ found incredible his testimony that he experiences daily pain at a level of six out of ten in his ankles and eight out of ten in his calves.  (A.R. 18.)  An ALJ's credibility determinations are entitled to deference.  "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is patently wrong."  *Shideler*, 688 F.3d at 310-11 (internal quotations omitted).  The ALJ is required to consider the entire record in evaluating the claimant's credibility and to give specific reasons for the weight attributed to the claimant's testimony, but this court's role is simply to examine whether those reasons are supported.  *See id.*

In explaining the credibility determination here, the ALJ includes boilerplate language stating that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the RFC and explains only that "the medical evidence of record does not establish a medically determinable impairment(s) that could produce the pain, (A.R. 18).  As Pimentel points out, the former phrase consists of the precise language that the Seventh Circuit has criticized as "unhelpful" and "meaningless boilerplate," noting that "hackneyed language seen universally

in ALJ decisions adds nothing" to the credibility analysis. *Shauger*, 675 F.3d at 696; *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012). Although an ALJ's inclusion of this language is not in itself grounds for reversal, the recitation of credibility boilerplate coupled with a failure to adequately explain the credibility decision or to offer good "reasons grounded in the evidence" for discounting the claimant's testimony amounts to reversible error. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Here, the only explanation the ALJ provided—other than the "meaningless" boilerplate–for discounting Pimentel's pain complaints is his assertion that "the medical evidence of record does not establish a medically determinable impairment(s) that could produce the pain." (A.R. 18.) In other words, the ALJ rejected Pimentel's description of his pain because he found them unsupported by the objective evidence. But the Social Security Administration's own rulings make it clear that "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *See* SSR 96-7p, 1996 WL 374186, at *1. Instead, the ALJ is required to "carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). Where the ALJ's statement that a claimant's pain complaints are out of proportion to the medical records are "suspended over air," the credibility determination cannot stand. *See id.* The ALJ's decision here reflects exactly that error. Instead of pointing to any specific evidence that he relied on to support the conclusion that

Pimentel's lower extremity pain cannot be as bad as he says it is, the ALJ writes it off as being inconsistent with some unspecified medical evidence. And the ALJ's explanation is particularly problematic here, where the objective evidence documents that Pimentel is obese and has neuropathy, conditions that can cause joint pain and painful cramps, respectively, of the kind Pimentel described. *See* STEDMAN'S MEDICAL DICTIONARY 1313 (28th ed. 2006). Because the ALJ did not give a supported reason for discounting Pimentel's lower extremity pain, the ALJ should reevaluate that testimony alongside the evidence of his obesity and neuropathy on remand.

Pimentel also challenges the ALJ's decision to discredit his complaints of fatigue, arguing that the ALJ mischarachterized his testimony on this point. The ALJ found that Pimentel "is not fully credible in asserting that he is tired every day causing him to just fall asleep unpredictably." (A.R. 18.) Pimentel argues that this statement mischaracterizes his testimony because he did not say that he falls asleep "unpredictably," but rather testified that he does not "want to take a nap during the day, but I just fall asleep sometimes during the day." (Id. at 86.) But whether Pimentel explained that he falls asleep unpredictably or involuntarily—and whether there is a relevant distinction there—is less important than the fact that the ALJ's blanket statement provides no explanation as to why he disbelieved Pimentel's description of his fatigue. As fatigue is a known symptom of depression, *see* STEDMAN'S MEDICAL DICTIONARY 515 (28th ed. 2006), before discrediting Pimentel's testimony regarding that symptom the ALJ was obliged to provide some explanation,

supported by record evidence. *See Martinez*, 630 F.3d at 697. This he did not do, and accordingly this aspect of the credibility determination should also be reexamined on remand.

Pimentel's remaining arguments center on his contentions that the ALJ failed to properly account for all of his impairments, or for his obesity in combination with his other symptoms, in crafting his RFC. He first argues that in assessing him as having an RFC for light work, the ALJ failed to account for his difficulties in bending and walking. As Pimentel points out, the ALJ wrote that aside from Pimentel's descriptions of his lower extremity pain and fatigue, he found Pimentel's testimony and complaints to be "generally credible." (A.R. 18.) Pimentel testified that he has trouble bending over—as he put it, "because I'm fat"—and that he can walk for only two blocks before having to stop for a rest. (Id. at 81-82.) According to the ALJ's credibility analysis, the ALJ believed these claims, but he did not work them into any narrative explaining why Pimentel is able to perform light work despite these difficulties. *See* SSR 96-8p, 1996 WL 374184, at *7 (requiring an ALJ to include a narrative discussion in the RFC assessment matching up the evidence and the conclusions about a claimant's capabilities). The ALJ limited Pimentel to walking for a total of four hours out of an eight hour day, and for only 15 minutes continuously, but did not explain how that limitation meshes with Pimentel's testimony that he needs a break after walking only two blocks. The ALJ did not address the bending limitation at all, which is particularly problematic given that Pimentel's testimony in this regard is substantiated by Dr. Chintamaneni's observations. (*See* A.R. 461.) Although the ALJ acknowledged Dr. Chintamenni's observation regarding the bending restriction in listing the evidence at

22

step two, (id. at 14), he did not address it or account for it in formulating the RFC. On remand, the ALJ should explicitly evaluate these limitations and provide the requisite narrative explaining how Pimentel's difficulties in walking and bending are accounted for in the RFC assessment. *See* SSR 96-8p, 1996 WL 374184, at *7.

Less persuasive is Pimentel's side argument concerning the ALJ's failure to address the side effects of his medications. It is true that an ALJ is required to consider the side effects of medication when there is evidence that they cause significant symptoms. *See Binion v. Shalala*, 13 F.3d 243, 247 (7th Cir. 1994). But here, Pimentel testified only that his medications make him nauseous and cause his heart to beat fast. (A.R. 85-86.) He did not say that his nausea and racing heart interfere in any way with his daily activities or with his ability to work. Nor has he pointed to any evidence that shows that those symptoms contribute to the allegedly disabling effects of his other symptoms. Because it is Pimentel's burden to establish the severity of his symptoms, *see Clifford*, 227 F.3d at 868, and he has not met that burden with respect to his medication side effects, the ALJ did not commit reversible error in failing to address them in his RFC assessment.

Finally, Pimentel argues that the ALJ erred in failing to address how his obesity in combination with his other impairments—neuropathy, depression, degenerative disc disease—impacts his ability to perform full-time work. The Social Security regulations and the Seventh Circuit have made clear that an ALJ is obliged to consider whether and how a claimant's obesity in combination with his other symptoms may increase his functional limitations. *See* SSR 02-1P, 2000 WL 628049, at *5-*6; *Villano v. Astrue*, 556 F.3d 558,

23

562-63 (7th Cir. 2009). In other words, once the ALJ determines that a claimant has at least one severe impairment, he is obliged "to consider the *aggregate* effect of this entire constellation of ailments—including those impairments that in isolation are not severe." *Golembiewski v. Astrue*, 322 F.3d 912, 918 (7th Cir. 2003) (emphasis in original). And because obesity in particular may aggravate other symptoms, it "must be considered for its incremental effect on the disability." *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). Here the ALJ listed obesity as one of Pimentel's severe impairments, but did not consider in the RFC assessment how his weight might impact his other impairments, including his degenerative disc disease and neuropathy. (A.R. 14.) On remand, the ALJ should analyze whether and to what extent a disabling impact stems from the combination of Pimentel's obesity and his other symptoms.

**Conclusion**

For the foregoing reasons, Pimentel's motion for summary judgment is granted to the extent it seeks a remand and the Commissioner's cross-motion for summary judgment is denied. The case is remanded for further proceedings consistent with this opinion.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**

25